May it please the court. My name is Evan Stein, and I, along with my co-counsel, Jason George, represent the plaintiffs. I'd like to reserve four minutes of our time for rebuttal, please. Are you going to split the time with co-counsel? Yes. Roughly speaking, how do you want to divide it? We'll be splitting the eight minutes each at the beginning and two minutes of rebuttal each at the end. Okay. So keep your eye on the clock. It counts down. Okay. Thank you. I will be arguing that the plaintiffs in this case maintain prudential standing to bring their claims, while my co-counsel, Mr. George, will argue that the agency's actions in this case triggered their duty to conduct environmental and cultural review. Before I begin on standing, I'd like to acknowledge the many members of the Pit River Tribe and the other plaintiffs that have made the eight-hour journey from northeastern California to be with us today. On the issue of standing, plaintiffs' interests are at the heart of the land management multiple-use statute at issue here, the Geothermal Steam Act. And when an act limits the rights of one party to the potential benefit of a second party, that second party has standing to enforce those limits. Here, BLM is limited by the Geothermal Steam Act in how, when, and where it can lease and extend leases for geothermal steam development. Plaintiffs allege in this case that BLM has gone outside those limits in extending the 26 leases at issue here. Counsel, it'll be really helpful to me in this argument if you use distinguish between extending leases and continuing leases, given the statute. Yes, Your Honor. Thank you. Continue, excuse me. Thus, plaintiffs here should be able to sue to enforce those statutory limits placed on BLM because they seek to ensure that their uses of the land are not potentially disrupted by unlawful government use of the land. Here, the plaintiffs make many uses of the land. For example, the Pit River Tribe has for 10,000 years used the land for spiritual purposes. The other plaintiffs in this case use the land for environmental, recreational, and aesthetic purposes. Indeed, there are even homeowners in the plaintiffs here. All of these uses are governed by the doctrine of multiple use, which itself governs the entire Geothermal Steam Act explicitly. Is all the land in question national forest land? Yes, I believe so, yes. And BLM administers that land. Because all these uses fall under the doctrine of multiple use, the plaintiffs are explicitly covered by the Geothermal Steam Act's zone of interest and have standing to enforce the limits placed on BLM here. The opposing party argues that it's not good enough to generally look to the Geothermal Steam Act and that under Bennett, in particular, you're required to be more specific than that vis-à-vis your standing argument. Your Honor, the government misreads the Bennett case. The proposition that Bennett stands for is that this court should not look to the primary purpose of a statute to exclude plaintiffs from the courthouse. So in that case, the primary purpose of the Endangered Species Act was to protect endangered species. The lower court there rejected plaintiffs' standing because they did not seek to vindicate that particular interest. The Supreme Court said that that was not the proper test. Rather, this court should look to the statute and see if the plaintiffs' interests are protected anywhere in the statute. That is all that Bennett says. So here, we can see explicit congressional reference and protection for the multiple-use doctrine, which, again, all the uses that plaintiffs make of the land fall under. That is in Section 1016 of the statute, which directs that the entire GSA be administered under the mandate of multiple use. I would also like to dispel the government's argument that the discretion issue that my co-counsel will discuss involving our NHPA and NEPA claims somehow decides the standing issue in this case. That is not correct. Indeed, the two claims are entirely separate and distinct. They involve different legal arguments, different legal reasoning, and rely on different precedent. Our GSA claim is that the BLM violated the letter of the law when it extended these 26 leases. It could not take the action that it took. Did you mean continue? I'm sorry, Your Honor. Yes, continue. Continue for 40 years. They could not take that action within the limits placed on them in the law. On the other hand, our NHPA and NEPA claims argue that before taking this action, they needed to conduct environmental and cultural review and that they had ample discretion when they made this decision to benefit and consider environmental and cultural resources. Thus, these issues are completely separate and should be decided by this Court separately. I'd also like to briefly address the government's contention that this Court is limited, as Judge Christin referred to, to looking only at Section 1005A, and they rely on the Bennett case for that. But they also rely on the Court's order. That's what the district court thought, right? Yes, I believe. And in part, the district court thought that because of concessions he understood that you'd made. I don't want to interrupt you. I want you to proceed with your argument, which I think was going to be a case law argument or a statutory argument. But I'd also like you to talk on this vein about what you represented to the Court at the time of argument. I'm not sure it's specifically what you're referring to. I think there's a footnote. It's footnote 2 in the Court's order that talks about concessions that you're not proceeding under 100, 0, forgive me, paragraph 107A through C or E, that you had said you're not proceeding under those, but you are proceeding under subparagraph D. And if I've confused you and it looks like I have, feel free to respond and rebuttal to that point. Yes, Your Honor, I will definitely do that. All right. Apologies. As I said, the Court, the government misreads the Bennett case. And, indeed, this Court can and should look outside the specific section at issue to understand and ascertain the proper zone of interest protected by the Geothermal Steam Act. This has been done by many courts, including this Court. It has never been a controversial issue. In the Bennett case itself, the Court looked outside the specific section under which the claim was brought to find that the plaintiffs had standing. This Court, in the Desert Citizens Against Pollution case from 2000, looked outside the specific section in the Federal Land Policy and Management Act to decide that the plaintiffs' interest, environmental plaintiffs, were protected by that statute. Now, you used the word prudential standing at the very beginning as you were introducing your arguments. Does Lexmark say that we really shouldn't be using the word prudential anymore? Apologies, Your Honor. I believe that's correct. Statutory standing is. Statutory standing. And is this basically an APA challenge, arguing that the Geothermal Steam Act has been violated but is basically an APA challenge? Yes, Your Honor. We are suing through the APA. And so what's the standard for how broadly we read the zone of interest protected by the underlying statute if we are dealing with an APA challenge? Well, Your Honor, there are several cases on that. The court should look to, can look at any parts of the statute to determine the zone of interest. There is nothing limiting the court to putting blinders on in reference to one section of the statute. Indeed, in the Pachack case from the Supreme Court in 2012, the court looked to regulations. It looked completely outside the statute to ensure that the plaintiffs' interests were protected. But isn't this one reason it's very important that the district court thought you were suing under 1005A? Yes, we are suing under 1005A. That's correct. Yes. If that's what you were referring to before, I apologize. That's correct. Well, this is an important distinction, I think. There's another several places in the record where you talk about suing on the 1998 decision. And the 1998 decision can be construed as continuing leases under 1005A, or it could be construed to encompass the BLM's decision to treat those unproven leases as subject to continuation rather than extension. Yes, Your Honor, but the continuation provision is 1005A. I get that. Right. I understand that. But one is a much broader scope. The latter is a much broader scope. If the 1998 decision that is being challenged encompasses BLM's changed statutory interpretation, that's one thing. Right. If the decision that's being challenged is the continuation of leases under 1005A, which the BLM says is not a discretionary decision, that's a different case. And we have not conceded that we believe they did change their interpretation. But it shouldn't really affect the zone of interest test here, because plaintiffs seek to ensure that government does not take unlawful action, and they seek to make multiple uses of the land that are explicitly protected by the statute. And in that way, they fall well within the zone of interest of the statute. So the district court's decision that your claims only arise under 1005A was inaccurate? Yes, Your Honor. It's broader. It's broader than that. Yes. We have not conceded. Okay. So then you have not conceded. So then tell us what your position is. How broad is it? And why did the district court make an error? Why was the district court wrong? The district court was incorrect if it assumed we conceded the idea that the BLM changed its interpretation unlawfully. But importantly, that should not really affect the zone of interest test, as I've described it. I'd like to reserve the remainder of my time for my co-counsel. Okay. Thank you. May it please the Court, my name is Jason George, and I will argue that BLM has to perform environmental and cultural review under the National Environmental Policy Act, the National Historic Preservation Act, and the Federal Indian Trust Doctrine when continuing geothermal leases for 40 years. Without this review, BLM will slate the Medicine Lake Highlands to four decades of industrial development without considering the detrimental effects to the area's environmental resources and cultural treasures. Under this Court's en banc precedence in Karuk Tribe and NRDC v. Jewell, an agency must perform review if it has even some discretion to exercise judgment in a manner that could inure to the benefit of environmental or cultural resources. The sections I issue here provide that discretion. Sections 1005A and D, read together, state that a lease extension shall be granted so long as BLM makes a finding that diligent efforts have occurred. Diligent efforts is not defined anywhere in the statute nor in any regulation. Instead, diligent efforts must be read in the context of the entire statute. And the GSA here sets out a statutory scheme that is dedicated to the responsible development of geothermal energy and contains a mandate for administering it under the principles of multiple use, the public interest, and a mandate to institute environmental protections. Let me understand the argument that I think you just made. You're saying that the continuation of the leases under 1005A is discretionary because the is dependent upon the satisfaction of a particular criterion and the judgment of whether the criterion has been satisfied is discretionary? Is that the argument? That's part of the argument that, yes, that diligent efforts requires judgment both at the evaluation stage and when they define diligent efforts. Because BLM, because it's not defined anywhere else, BLM can define diligent efforts on a case-by-case basis dependent on the issues in each particular lease. So, for example, if you have two leases and one is in environmentally and culturally sensitive land and one is in land that doesn't have those sensitivities, it must be the case that BLM can define diligent efforts differently in each of those locations. What's your authority for saying that the BLM can apply the criteria differently depending on the environmental sensitivity of the land? The authority is that the statute itself contains ambiguity in the phrase and the fact that BLM So what part of the statute are you pointing to when you say the statute itself contains ambiguity? The diligent efforts phrase. But then also sections 1016 and 1023 contain the multiple-use public interest and environmental protection mandates that tell BLM to manage the lands in a way that will benefit environmental and cultural interests. I have to say, if we're focusing only on the diligent efforts language of subsection D, I don't see that that language allows the BLM to consider as part of the determination of diligent efforts whether the land is environmentally sensitive. What am I missing? It's when they define diligent efforts. So diligent efforts could be It doesn't necessarily itself need to contain environmental or cultural concerns. It could be that there's environmentally and culturally sensitive land. And diligent efforts, they could say in this land, you have you maybe only dig two wells and you act very carefully and you use the best technology when you're developing that land so that you don't destroy something accidentally. Whereas in another place, they might say you need to develop more quickly, you need to show us with five wells instead of two wells in that case. Is there any regulation promulgated under the GSA that gives that interpretation to diligent efforts? Not strictly, but there's no regulation that precludes it. And BLM's actions in this very case show that it does consider these sorts of things when it's making its decisions. In this very case, BLM required Calpine to give them environmental information as part of their diligent efforts determination. I believe that's on page 478, 475, and 491 of the record. I'm sorry, could you give me those pages slowly? Yeah, sorry. 478, 475, and 491. There, Calpine submitted as part of its diligent efforts determination information on an assessment of spotted owl habitat, on surface water sampling data, and on other environmental activities. The fact that BLM required that information shows that it does consider and can consider environmental interests when it's making its decisions. And furthermore, BLM consistently considers the public interest as part of its management of the leases. So in the May 1998 decision where BLM extended the leases at issue here, or, sorry, continued the leases for 40 years, they premised that decision on the fact that they wanted to protect the public interest. Although they could have decided to cancel the leases, cancel the unit agreement, or contract the unit, they purportedly decided that that was not in the public interest and decided that extending the leases would be better instead. And similarly, in July 1995, on page 472 of the record, July 1995 memo, BLM decided purportedly based on the public interest that diligent efforts within the unit would be digging one well for that year. The fact that they consistently consider the public interest shows that they can exercise judgment. And with this judgment, they could either deny the lease extension or impose further conditions on the leases that would protect the environment. This is just like NRDC v. Jewell. In that case, the agency found that there was discretion because the agency could refuse to renew water contracts or at the very least could impose, could renegotiate specific terms of those contracts that would benefit the Delta smelt, in that case the timing of water deliveries. Similarly here, BLM could either deny the lease extensions or impose further conditions on those leases. And that is actually even independent of the diligent efforts requirement. As that ability comes from the lease itself, I'd point you to page 671 of the record for the section 14 of the leases which provide that ability. I'd like to reserve the rest of my time for rebuttal. Thank you. May it please the Court. My name is David Shellady. I represent the federal agency defendants. At council table is Thomas Cincinnati. He represents Calpine, the project proponent. I'll be arguing for the defendants today. Calpine has formally joined the brief that we filed on behalf of the federal agencies.  So you're not splitting argument. That's correct, Your Honor. Thank you. I want to talk a bit about the logic of section 1005. And then I'm going to explain why I think the Patch Act case supports our position in this case and not their position. I'm going to address a couple of misimpressions I think I've seen in the reply brief. And then if time allows, I'm going to double back and talk about why I think this Court's decision in the first Pitt River appeal supports our position on all issues in this case. Congress made lease continuation mandatory for a very important reason. The sections of the committee reports that are quoted in our brief show that Congress considered geothermal energy to be an environmentally friendly energy resource that needed to be encouraged and that encouragement would be required because Congress recognized that this is an extremely risky endeavor and investment would have to be encouraged if this resource were to be developed. And that really explains why section 1000 reads the way it does. The development of a geothermal resource is a process that requires years of effort and tens of millions of dollars of investment. You can see that from the record of this case and from Pitt River 1 as well. We were 10 years into the leases in this case when the continuation decision for the 26 leases at issue here was made and 11 years into the leases in this case when the lease owner at that time was finally able to submit a development proposal. Now, no interest would be served by subjecting leases to discretionary continuation decisions just 10 years into the primary term. If a leaseholder knew that it would have to invest tens of millions of dollars to get to a point where BLM could deny lease renewal based on competing third-party interests or competing potential uses, the investment that Congress sought to encourage in the Geothermal Steam Act would be discouraged instead. Now, I think you are making at the same time both an argument against standing to bring a GSA APA challenge but also arguing against any NEPA or National Historic Preservation Act. I am, yes, Your Honor. Could you separate those two things out and talk first about them? I'm going to address zone of interests first unless you prefer that I address the other claims first. The zone of interest is fine. All right. So zone of interests, as we argued in our brief, has to be determined in reference to the purposes served by the particular provision invoked as the basis for suit. It's a misunderstanding of our position to say that means you don't look to the general purposes of the statute or the other sections of the Geothermal Steam Act. The Court does so. As in any other endeavor of statutory interpretation, the particular provision has to be read in context of Congress's purpose and the other statutory language. But here, Congress was very specific in using the word shall continue in Section 1005A and limiting BLM's consideration to very specific statutory criteria. Yes, I get that. But if I'm talking about an APA challenge under the GSA, that just means that you've got certain statutory criteria upon which to base the shall continue decision. And if you, and I'm not saying that you did, but if it turns out that you are misapplying the criteria and that the continuation should not be allowed, why is it not an appropriate reading of the statute to allow those who would be benefited by the leases being discontinued? Why can't they bring suit? Why can't I read the statute to entertain that possibility and to protect that interest if you are violating the terms of the statute? Well, yes, thank you. Let me focus specifically on that. Of course, the question of whether we're violating the terms of the statute goes to the merits, and the Court does not decide the merits before deciding whether Congress is up for it. No, I got that. But more specifically, Your Honor, there are two Supreme Court decisions that explain that in applying the zone of interest test, injury, in fact, is not enough. That a misapplication of the statutory language would cause harm to the putative plaintiff is not enough to bring the plaintiff within the zone of interest. So we have to consider, as the Supreme Court has explained in its most recent cases, what is the zone of interest that Congress intended to protect in this particular statutory language, and are the plaintiff's interests among those. So it is a purpose-based analysis. It's congressional purpose in adopting the specific provision that has to be determined. That's why it's so important, it seems to me, that the district court thought the specific position was provision was 1005A. Yes, Your Honor. And that is so. And I was listening to your questions earlier, and I think the key to that issue really is that in applying the zone of interest test, the question is, what is it that the plaintiff's claim was violated? And then the court considers the zone of interest protected by that provision. Right. The claim in this case is that BLM violated section 1005A when it recognized continuation for the 26 leases. Well, they say several different things. But there are several places in their briefing where they argue that the part of the decision and that it was wrong for BLM to consider these, I'm going to call them unproven leases, the 26 leases, as subject to continuation rather than as being subject to extension. Yes, Your Honor. And what the May 18, 1998 decision did was recognize that these leases were entitled to a continuation under paragraph A of section 1005. So, again, it takes us right back to 1005A and not something else. Well, part of their briefing is that you should have been talking about 1005G, for example, that these ought to have been treated as extensions, not continuations. Well, if ---- And that's a different statutory provision, and that's Pitt River I. It's a very different case, counsel. If the plaintiffs claimed that section 1005G was violated, that the court could consider whether there is a 1005G claim before it. But BLM didn't take action under section 1005G. It acted under section 1005A, and that's why there's ---- And they're complaining about that. They're complaining about that, counsel. That's part of the problem. And it just strikes me that the place where this case narrowed and really telescoped down to 1005A scope, I think, is in this footnote of the district court's order where the court wrote that paragraphs 107A, B, C, and E of the complaint were provisions that the plaintiffs were no longer pursuing. Right? Yes. And that left paragraph D, subparagraph D, I should say. Yes. And the court has characterized that argument as being just about lease continuation. Well, the source of that finding in the district court's opinion is an express waiver by the plaintiffs, which appears in the record excerpts at page 287. Yes. We had filed a motion to narrow the case, and we withdrew that motion based on a stipulation in which the case was narrowed to the May 18, 1998, decision. But the May 18, 1998, decision is not a paragraph G decision. It's a paragraph A decision. And that's why they have to show that granting a continuation under paragraph A was improper. Okay. Let me ask it this way, but it's designed to be a continuation of the questions that Judge Christin has been asking. If, this is several steps down the road, if we were to hold that the plaintiffs have standing under, I'll call it Lexmark, but they've got APA standing because there is what's within the zone of interest. So the plaintiffs have standing. We remanded the district court. The district court finds against you, saying that you can continue the one lease that's in production, but under subsection A, you do not have the authority to continue the other, the 26 leases. Are you finished? That is to say, is there no valid continuation or extension or anything? You're just done? No, Your Honor. In that event, the second decision of this Court in the first Pitt River case teaches that the leases would be capable of continuation or capable of extension. So you're now relying on G? No, Your Honor. What would then be applied would be the current version of the Geothermal Steam Act, because the 2005 amendments to the Geothermal Steam Act authorized leaseholders to elect to be governed either by the old regulations or the new regulations. And so in that event, BLM would and Calpine did so. It elected to have these leases governed by the post-2005 amendments regulations. And that would be dispositive, right? Which set of regulations apply would be dispositive? Of course, getting to the merits, but. It would, yes. Yes. And would that require new action by BLM, or would it automatically kick in? BLM would issue a decision. Yes, Your Honor. And that decision could then be challenged? Well, it depends. I'm not sure I quite understand challenged under what? Challenged as a violation of the Geothermal Steam Act? Potentially, if this Court had already determined that third parties asserting competing use claims can bring such a claim, then it could be challenged as a violation of the Geothermal Steam Act? But it would be a separate action that could be challenged. I understand you would preserve your standing objection unless we've already ruled authoritatively against you. But I got it. So if we were to start a chain of decisions that eventually results in holding, number one, standing for these plaintiffs, and number two, the continuation of the 26 leases that are not in active production violates subsection A, you would then, BLM would then take a subsequent action either allowing or not allowing a production on those 26? That is correct. Okay. Does Lexmark change your analysis at all, counsel? I'm sorry, Your Honor? Does Lexmark change your analysis? Both parties cited Lexmark just in passing, and so. No, Your Honor. Lexmark doesn't change the test, and it does not change the applicability of the test to claims brought under the Administrative Procedure Act. The Court reaffirmed in Lexmark both that this is the applicable test and that it applies to APA cases. And so the only thing that Lexmark really changes is that we no longer call it prudential standing. Right. But the test that Lexmark continues really is the Clark v. Securities Industry test that the Court very explicitly says is a generous test in favor of plaintiffs seeking to bring suit. Well, I acknowledge, Your Honor, that it is a generous test. I think the subsequent Supreme Court decisions have very substantially clarified Clark. Clark did not acknowledge, as Bennett and three other subsequent decisions do, that the focus of the analysis must be the particular provision invoked as the basis for suit. Clark did not acknowledge that, but it's been — but that's — the Supreme Court has so held in four subsequent decisions. Right. But the general language that zone of interest on an APA test is a generous test remains. I acknowledge that, Your Honor. Yeah. But it is not met — it is not met in a case like this one where the plaintiff's interests are actually antagonistic to the statute invoked as the basis for suit. Now, why do you say it's antagonistic to the statute? The statute gives to the government a certain set of obligations. It gives to the lessee a certain set of rights. But if the rights don't exist and the government has violated the obligations by granting a continuation that's not — that the lessee is not entitled to under the statute, I mean, why is that contrary to the statute, that that obligation should be — that the statutory term should be enforced? Your Honor, their interests are not antagonistic to the statute as a whole. The statute provides for environmental review at many stages along the process, but not at this stage. The zone of interest protected by Section 1005a is an expectation in the lessee that its lease will be continued long enough to realize a return on its investment if — As long as the statutory criteria are fulfilled. Exactly, Your Honor. If the lessee meets the milestones established by Congress — Yes. — and nothing else — But if the statutory criteria are not fulfilled, why is it contrary to the terms of the statute to enforce the terms of the statute? Because the plaintiff's interests are not among the interests that Congress intended to protect. Whose interests are protected besides the lessee, in your view? Anybody? Well, I'm not sure whether anyone, Your Honor. Potentially, another — another would-be developer. But the purpose of 1005a was to create and then to protect the interests of the developer adequately so as not to discourage investment and nothing more. The plaintiff said — But if the purpose of the statute is to protect the investment-backed expectations of the developer so as to encourage development, which I think is absolutely right — I mean, I totally agree with that reading of the purpose of the statute — why is it consistent, as you suggested, to allow a competing developer to come in and enforce the terms of the statute? That is to say, here are the criteria. The criteria have not been fulfilled. The investment-backed expectations have been fully fulfilled under the terms of the statute. So if that's consistent with the terms of the statute to allow another developer to enforce it, why is it inconsistent with the statute to allow someone who has some other use of the land in mind to enforce the statute? Well, I think I probably did not express myself clearly enough, Your Honor. I'm not here taking the position that another developer's interests are protected. So you're saying — You ask me if anyone — I'm sorry. So you're saying maybe nobody has the right to enforce the terms of the statute? Perhaps so, Your Honor. Oh, my goodness. Perhaps it — it may be, Your Honor, that no one other than the existing leaseholder has authority to enforce Paragraph 1005a. Except for this Court. But as — but as you have heard from the plaintiffs this morning, BLM takes seriously its obligation to protect public interests, and it does so. We do assume that the agency will faithfully perform the obligations established by Congress. That has to be part of the assumption in interpreting the congressional design. We heard the argument from the second of the two students arguing that the BLM, in determining whether or not diligent efforts have been made under subsection D, considers environmental criteria as part of that decision. Do you agree with that? It does not consider environmental criteria, no, Your Honor. It does consider whether the leaseholder is performing environmental analyses, which will later be required for any development proposal and approval of any development proposal. So that work is necessary to be done, and it is considered diligent efforts. Does BLM impose in the leases any environmental conditions in terms of the manner in which the lease — lease lessee should perform its activities? Yes, Your Honor, and not only in — and not only in the lease, but in the regulations also. So while it may well be that there's a statutory entitlement to a continuation of the lease if there's production, and the criteria of subsection A are met, BLM retains discretion to dictate the terms in which the lease may be operated that include environmental conditions? Yes, that is — that is correct, Your Honor. And it does so. You can see from the record in this case that at various points along the line, BLM conducts environmental analyses, including environmental impact statements, in determining what activities it will authorize on the leases. But if the argument then is because it's a mandatory duty to continue the lease, therefore there's no obligation to comply with NEPA, that seems wrong, because there's an obligation to continue the lease, but BLM retains discretion to impose environmental conditions upon the operation of the lease. Well, I think this Court's already decided that question, Your Honor. So if I could — if I could address the Court's decision in Pitt River I, the Court there said that if the 2005 amendments to the Geothermal Steam Act, which made the extension of the type involved in that case, made it mandatory by use of the word shall, even though the mandatory extension decision was conditioned on satisfaction of minimum work requirements, even in those circumstances the Court held that that was mandatory, nondiscretionary, and therefore NEPA would not apply. And that's perfectly consistent with the Supreme Court's decision in National Association of Home Builders. It's also consistent with this Court's decision in Sierra Club v. Babbitt. It's — it is a — it is a well — it is a well-established principle, and — The principle is very clear. The question is what discretion do you have? Well, and the — the statutory provision that this Court considered in the Pitt River I decision in making that analysis is perfectly analogous to Section 1005a. It used the word shall, but it also required that particular statutory criteria be satisfied before — before BLM's decision was mandatory. And the Court correctly concluded there that in those circumstances NEPA — NEPA did not apply. NEPA would not apply. Thank you. Thank you. Thank you. I — I have paragraph 2 in front of me now. And the best explanation of that is — You mean footnote 2? Footnote 2. Sorry.   We understand that we cannot challenge directly the Supreme Court's decision to continue these 26 leases because they were — they were not — there was no paying well determination, and that they failed to show that diligence was met. So the facts from before 1998 are relevant to that claim, that they failed to show diligence under 1005a and D. So that, I think, is the answer to your question. We have not waived the facts that occurred before 1998, but we acknowledge we cannot directly challenge those actions. If the government concedes, as it apparently does, that this Court can look outside the specific section at issue, then the only reasonable conclusion is that the plaintiffs here are within the zone of interest of the statute. These plaintiffs use and care deeply about the land and how the government manages these public lands. They fall squarely within the multiple-use doctrine, and they're squarely within the interest protected by the zone of interest. The government may be correct that one of the interests here is to promote development and to ensure developers some right. Well, it was expressly. Yes. But that doesn't — Isn't that correct, counsel? That was an express purpose. Yes. That is one purpose of the statute. But that does not make BLM immune from review. And it does not change the fact that — And explain exactly why now. Because the statute protects the interests of the plaintiff in addition to those interests, and it shows that Congress contemplated these types of plaintiffs bringing suits through the APA. And where are we to look to that to find — to ensure that you're right? The multiple-use provision in the statute, Section 1016, which instructs BLM to administer the entire statute under that rule. And that shows that Congress contemplated these types of plaintiffs bringing APA citizen suits to ensure the government did not conduct unlawful lease continuations. I'd like to reserve the remainder of my time for my co-counsel. Okay. Thank you. Diligent efforts needs to be read in the context of the entire statute. And when read in the context of the entire statute, it's broad enough to encompass and give the ability to exercise judgment in a way that could inure to the benefit of which it meets the standard under Karuk Tribe. Second, I would like to address opposing counsel's statements about Pitt River I. The statements about May Deschalles in that case were dicta, were not even briefed in that case, and are not binding on this panel. And furthermore, the statute at issue there is much more particular than the diligent efforts requirement here. The statute at issue there had premised the extension on the payment of fees and the satisfaction of minimum work requirements, which ---- Here's a question that occurs to me as I read just the language of subsection A. Subsection A says that if the criteria for continuation of the lease are satisfied, the lease shall be extended for the additional period. Well, if it's a continuation of the lease, does that tell us that there's no power to modify the lease to include environmental conditions that are not already in the lease? That is to say, I'm coming back to this question of what's mandatory and what's not on BLM as it's required under the term shall to continue the existing lease. The lease itself contains a provision that states that the lessee shall meet the conditions set by the lessor to protect environmental, historical, and other concerns. That's on page 617 of the record in section 14 of one of the leases. And regardless of whether it's an extension or continuation, that will ---- that they can still impose those conditions so that the lease can be ---- And they can change the conditions? Our position is that the language allows that, Your Honor. Okay. Okay. Thank you very much. Thank both sides for arguing. And we would like to thank the Stanford Clinic for doing this. We'll compliment you, but you do this for a living. They're students and they're just starting out. But nice job for both sides. Thank you. The case of Pitt River Tribe v. BLM now submitted for decision. All rise. This court for this session stands adjourned.
judges: Silver, Fletcher, Christen